## Sullivan et al. v. Brawner, Sheriff, et al.

(Decided March 6, 1931.)

ALLÉN PREWITT and E. C. O'REAR for appellants.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellees.

Opinion of the Court by Judge Thomas—Reversing.

The appellant and one of the plaintiffs below, Michael G. Sullivan, is a local dealer in junk and operates his business in Frankfort, Ky., which consists in purchasing junk in varied quantities from the owners, the minimum price of each individual purchase being ten cents or less, and of only one small article to and embracing many, all of which may, or may not, be of the same class or quality. Plaintiff, Munich & Co., is a partnership composed of Max and Edwin Munich, who are what might be termed "wholesale" dealers in junk, and they operate their business in Lexington, Ky., buying the goods in which they deal mostly from local dealers of the type of plaintiff, Sullivan, and in large quantities, and they do not purchase in that manner until after receiving an order from their customors located in various parts of the country, and which orders, according to the averments of the petition, must be filled promptly because of the constant fluctuation in prices of the character of goods handled.

The two concerns, in their operating names, filed this equity action in the Franklin circuit court against appellee and defendant below, Murray Brawner, sheriff of Franklin county, and other named enforcement officers, whereby plaintiffs attacked the validity of chapter 171 of the session acts of 1930, the title to which reads:

"An Act to regulate the buying or receiving, selling or disposing of, used or second-hand or of new but broken or mutilated articles made of brass, copper, zinc, or lead, or of any composition of which the said metals or either of them are a part; or copper wire; and, prescribing penalties for violations thereof."

Its section 1 enacts:

"That any person who shall buy or receive, sell or dispose of, in person or by agent upon behalf of himself or any other person, firm, or corporation, used or second-hand, or new but broken or mutilated, brass, copper, zinc or lead, or of any composition of which the said metals or either of them are a part, or copper wire, with intent to defraud, shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary, not less than one nor

more than five years; or, in the discretion of the court, be confined in jail not less than six months nor more than one year and fined not less than one hundred nor more than one thousand dollars. If upon the trial of one charged with a violation of this section, it be proved that the defendant bought or received, sold or disposed of, any metal article or substance hereinbefore named, and that the defendant in so doing had failed to comply with *one* or *more* of the requirements of the following section, such proof shall be deemed prima facie evidence of the defendant's guilt." (Our emphasis.)

The first part of section 2 defines the word "buyer" to include any one who, by himself, agent, or employee, or any firm or corporation or any agent or employee of it, or by or through such agent or employee, buys or receives "any or either of the metal articles or substances, specified in the preceding section"; while the word "seller" is defined as including "any person or persons who shall sell or deliver to another any or either of the metal articles or substances mentioned in the preceeding section." Subdivision (a) of the same section (2) prescribes that, when any of the metal articles or substances mentioned in section 1 are purchased, the buyer shall take from the seller a written statement signed by him and giving his full name, place of residence, and post office address, his business and occupation, and a full description of the article, the date of purchase, the name of the seller, and stating that the seller is the owner thereof, and that such statements shall be sworn to by the seller before an officer authorized to administer an oath.

Its subdivision (b) prescribes that, when such required writing is executed and delivered to the buyer, he shall indorse thereon whether or not the seller is personally known to him, and, if not, that he shall then obtain a sworn statement from some reputable person stating that the seller is known to him and that he is personally acquainted with the seller. Subdivision (c) of the same section prescribes that the buyer, whenever he purchases an article or articles in any single transaction, shall cause it or them to be placed in a container unmingled with any other property, and which container shall be plainly marked with a separate and individual number, and the article so placed therein shall remain

so unmingled and not sold or otherwise disposed of for fifteen days from the date of the purchase and upon the premises of the buyer and at his place of business, if he has one within the commonwealth, but, if none, then at some place within the state.

Subdivision (d) of the same section prescribes that the buyer after making his purchase, and obtaining the affidavits referred to, shall write upon them the number of the container in which the article or articles so purchased are deposited and a description and location of the premises where the container is located in which the articles are deposited, and which shall be sufficient to identify and locate the premises, the container, and the articles, and that he shall "not later than the next Saturday next following such purchase, transmit such statement, together with all written identifications taken in connection therewith, as hereinbefore provided, either in person or by registered mail, to the Sheriff of the county in which such purchase is made," where they are to become a public record and be preserved by that officer in his office and be open to inspection at all reasonable hours "by any person whatsoever." Subdivision (e) of the same section compels the buyer to admit the sheriff or any of his deputies, or prosecuting attorney "or any person interested in such articles," upon his premises at any time to locate the containers and to examine and inspect them and all articles deposited therein. It also prescribes that the buyer shall be guilty of a misdemeanor if he fails to carry out and perform "any one or more of the requirements imposed upon him by the act as hereinbefore enumerated." Section 3 of the act prohibits the purchaser from buying any such article or obtaining it through exchange or otherwise from a minor or apprentice, provided he knows, or has reason to believe, the seller to be such, and punishes a violation thereof the same as is prescribed in section 1 of the act for purchasing any of the enumerated articles "with intent to defraud."

The petition averred, among other things, that the act was invalid, unconstitutional, and void for a number of grounds specified therein to be hereinafter taken up and discussed; that, with reference to the conducting of the business of plaintiff, Sullivan, many purchases of the forbidden articles were made by him involving as many separate transactions with separate individuals,

and that the articles purchased ranged in size from a brass or copper tap to parts of a large boiler or other second-hand machinery of considerable proportions and dimensions, thus creating the necessity of the containers required by the statute to be of huge dimensions, or of various sizes and proportions to accommodate each individual transaction; that, since the act requires each purchase to remain in the container, unmingled with other purchases, for fifteen days, a compliance with the statute in this particular would entail, not only an enormous expense in providing the containers, but that the vast number of them required for purchases throughout fifteen days would necessitate such expansive storage room as would exceed the dimensions of the present premises of a great number of dealers who would be compelled to enlarge them or to discontinue their purchases after each of their provided containers was occupied by the article or articles of each purchase until they could be emptied after the fifteen days waiting; or they would have to cease doing business as dealers in such articles.

With reference to the plaintiff, Munich & Co., it was averred that their purchases of such articles were mostly in large quantities from a truck load, to perhaps more than a carload, and that the containers required by the statute would have to be the size of a silo or a standpipe for a waterworks system, or, perhaps, larger. The expense, the inconvenience, the impracticability, and perhaps impossibility of which is at once apparent. The same plaintiff, as we have hereinbefore stated, also averred that it dealt in such articles by wholesale, making its purchases after receiving orders from its various customers, and that, because of the exigencies of the business, it was compelled to make delivery at once after acquiring the goods with which to fill its orders, and to require it to permit its purchases to remain in the containers for fifteen days, as demanded by the act, would destroy its business as such wholesale dealer, to say nothing about entailing an expense that would be absolutely prohibitive.

It is further averred by plaintiff, Sullivan, that a great number of his purchases of the articles dealt with by the statute were small in quantity, sometimes involving only a single article of very small value and greatly less than the fee of the officer before whom the required writing or writings should be acknowledged or sworn to, and that as to all such purchases that requirement alone

would also be prohibitive. Other inconvenient, prohibitory, expensive, and impractical results from a compliance with the provisions of the act are pointed out in the petition, and all of which were admitted by the demurrer filed to it which the court sustained, and, upon plaintiffs declining to plead further it was dismissed, from which judgment they prosecute this appeal.

Among the various attacks upon the validity of the act contained in the petition are these: (1) That section 1 of the act, defining the chief offense created by it (that of buying any of the prescribed articles "with intent to defraud") is so vague and indefinite as to render it incapable of enforcement, and for which reason it is invalid; (2) that the prima facie presumption of guilt also contained in that section is invalid because some, if not all, of the prescribed prima facie facts have no rational connection (according to the experience of mankind) or relationship to the principal fact to be established, which in this case is the purchasing of any of the forbidden articles "with intent to defraud"; (3) that subdivision (e) of section 2 of the act is violative of section 10 of our Constitution in that it prescribes for enforced and unlimited searches of the buyer's property and possessions without a search warrant; (4) that the attempted regulations governing the purchasing of such articles exceed the power of the Legislature to prescribe, since their effect, according to the admitted averments of the petition, is to prohibit and not merely regulate, and which are not confined to only junk dealers, but apply with equal force to all purchasers thereof either for their individual uses or otherwise, and for which reason also the statute is illegal, and (5) that it is violative of the requirements of section 51 of the Constitution in that the act itself is not confined to the subject contained in the title, some of which will be disposed of in the order named.

Preliminary to the seriatim consideration of plaintiffs' attacks of the statute, and in partial response to the argument of defendants' counsel, that the business of junk dealing is a proper subject of stringent regulation under the police power, it should be observed that neither the act nor its title anywhere, either expressly or inferentially, refers to that business; nor is there any language in the act confining its provisions thereto.

On the contrary, by express terms, in defining the word "buyer," as employed in it, the provisions of the

act apply to *all* transactions between *all* persons wherein a purchase of any of the articles mentioned in section 1 of the act is made. Therefore, the citizen who buys any amount of copper wire, whether new or secondhand, or whether in original packages or only parts, comes under the ban of the act, and the same is true if he, for his personal use and not as a dealer in junk buys any secondhand article for domestic use, if any part of it is made of any of the metals embraced by the act. If he buys a secondhand stove with a brass knob, or a brass lock, or one veneered with brass, or any other secondhand article composed entirely or in part of brass, copper, zinc, or lead, even to a tack or nail, a pin or a needle, he must procure the required affidavits of identification of the purchaser, provide a container, and keep the purchased article in it for fifteen days, and also perform the other requirements of the statute to escape becoming an inchoate felon with the possibility of being incarcerated in the penitentiary if the jury should accept the enacted prima facie presumption against him, arising from his omission to observe any of them.

The same consequences follow if the good housewife buys from a secondhand store, or from a neighbor, any brass, copper, lead, or zinc household article, or one made of any composition of either; or if, perchance, she should purchase an antique candelabra or candlestick made in whole or in part of either of such metals. So that should she purchase any antique furniture she should beware that none of the locks, keyholes, keys, or ornamentations are made of any of the metals dealt with by the statute either in whole or in part, and protect herself by complying with the provisions of the statute, even to the preservation of the china safe, sideboard, piano, or thing purchased, in a container for the required fifteen days. Such interpretation is neither an exaggerated, nor a strained one. On the contrary, it is the *only* one conveyed by the express language of the act, and from which there is no escape. Therefore the reasonableness of the regulatory provisions of the statute, as confined to junk dealers, is not actually presented to us.

Taking up now attack (1) made on the involved statute, it may be stated generally, as one of the fundamental rules governing the validity of a statute, that, if it is couched in language "so vague, indefinite and uncertain that the courts are unable to determine, with any reasonable degree of certainty, what the legislature intended,

or so incomplete or so conflicting and inconsistent in its provisions that it can not be executed, it will be declared to be inoperative and void." 25 R. C. L. 810, sec. 62. That is true, with, perhaps, greater emphasis as applied to statutes creating crimes and punishments therefor, which, according to the law as everywhere announced and declared, "should be so clear and explicit that all persons of ordinary intelligence who are subject to their penalties may understand their provisions. If the meaning of a criminal statute can not be judicially ascertained, or if, in defining a criminal offense, it omits certain necessary and essential provisions which go to impress the acts committed as being wrongful and criminal, the courts are not at liberty to supply the deficiency or undertake to make the statute definite and certain." R. C. L. supra, page 812, sec. 62. Additional text authorities are unnecessary, since there are none to the contrary—all of them indorsing the general rule as contained in the inserted texts.

In the case of L. & N. R. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 18 Ky. Law Rep. 42, 33 L. R. A. 209, 59 Am. St. Rep. 457, a statute of this state, penalizing extortionate rate charges by railroads, was before this court for interpretation. The statute denounced the exaction of unreasonable compensation for such transportation, and it held that the act which it attempted to denounce as a crime was described in language so vague and indefinite that the statute could not be enforced, and for which reason it was held to be invalid. Cases from other courts involving the same point, and in which the same conclusion was reached, are cited and commented on in that opinion, and we will not restate them in this one. In the case of Connally v. General Construction Co., 269 U. S. 385, 46 S. Ct. 126, 128, 70 L. Ed. 322, the Supreme Court of the United States had before it the validity of a statute of Oklahoma making it a misdemeanor punishable by fine to pay employees on behalf of the state "less than the current rate of per diem wages in the locality where the work is performed," and it subjected contractors or subcontractors in the execution of state work to the penalties of the statute. After elaborate discussion fortified by numerous cited cases from the same court dealing with the same principle, it was held that the act under consideration was void for vagueness and uncertainty, and to enforce it would violate the

due process clause contained in the federal and state Constitutions. It was held that the statute then under consideration was vague and uncertain in the use of the words "current rate of wages" and also in the use of the word "locality," since there were no standards contained in it whereby the application of these expressions could be measured within any degree of accuracy or to any construction approaching an exact definition.

In the course of the opinion the court quoted with approval an extract from the opinion of the Supreme Court of the District of Columbia in the case of United States v. Capital Traction Co., 34 App. D. C. 592, 19 Ann. Cas. 68, saying: "The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another."

In the Connally opinion it was pointed out (and which is the universal rule as announced by other courts and text-writers) that a statute would not be declared invalid for vagueness and uncertainty growing out of "awkward or clumsy expression, or language wanting in precision," if enough appeared in it to point out with reasonable certainty what the Legislature intended to denounce as a crime; but, the court particularly pointed out that the vagueness and uncertainty would not be removed where the entire language still made it impossible to ascertain the precise act or acts that the Legislature means to denounce, and that, where its language left it open for two or more reasonable conclusions which it may have meant to denounce, then the statute cannot be upheld. In other words, where the entire context eliminates vagueness and uncertainty, the statute is valid; but where no such clarifying language appears, it will be declared invalid. Hence, the cases from this and other courts relied on by learned counsel for defendants, upholding statutes against obtaining property through

false pretenses "with intent to defraud," and against the issuing of what is usually denominated "cold checks," "with intent to defraud," have no application to the statute now under consideration, since in the two statutes referred to their entire context clearly indicates that the ones intended to be defrauded as referred to in them are those who were parties to the transaction with defendant and with whom he negotiated, to-wit, the one from whom he obtained the property in the one case, and the one to whom he delivered the check in the other. No such relieving language appears anywhere in the statute now under review, and, so far as its context is concerned, the one whom the buyer must intend to defraud, in order to commit the offense denounced, may be any one of a number of imaginable persons.

Whether it was intended by the Legislature to punish him if he intended to defraud the *seller* of any of the articles mentioned in the statute, or to defraud the person to whom he might sell or exchange the purchased article, or some person who might own or have some interest in it or them, is left in the dark with no lights furnished by the statute to dissipate that darkness. Under such conditions the court can do nothing but conjecture, and in doing so it would allocate to itself legislative functions, but which is everywhere conceded it has no right to do. Moreover, it is doubtful if a criminal statute so indefinitely and vaguely phrased would not violate section 11 of our Constitution in that it does not inform the defendant of "the nature and cause of the accusation against him." The discussion of this attack upon the validity of the statute could be lengthily extended, if necessary; but, since all adjudications and text authorities are in accord with the foregoing conclusions, we will refrain from doing so. Suffice it to say that the principles discussed, as we conclude, clearly stamp section 1 of the statute under consideration as being invalid because its language is so vague, indefinite, and uncertain as to be incapable of enforcement, and from which it follows that this attack is sustained.

Attack (2) against the involved statute raises the question of the limitations on the power of the Legislature to prescribe by legislative fiat the probative force of one or more proven facts as presumptive or prima facie evidence of the principal one involved. That the Legislature may so prescribe within certain limitations is not and cannot be disputed, but it may not arbitrarily

do so by enacting that the prima facie fact shall be evidence of the principal one when it has no reasonable or logical connection with the latter, or fitness to induce the conviction of its existence. As long as the enacted prima facie fact has a rational connection with and a logical tendency to prove the ultimate one, the authority of the Legislature to so prescribe is unquestioned; but without such attributes attaching to the enacted prima facie fact or facts it is incompetent for the Legislature by a mere statutory fiat to give them such effect, and which is most clearly pointed out by the Supreme Court of the United States in the cases of Mobile, etc., R. R. Co. v. Turnipseed, 219 U. S. 35, 31 S. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463; Bailey v. Alabama, 219 U. S. 219, 31 S. Ct. 145, 55 L. Ed. 191; Manley v. State of Georgia, 279 U. S. 1, 49 S. Ct. 215, 217, 73 L. Ed. 575, and others referred to in those opinions.

In the last-cited one the court had under consideration a statute of Georgia prescribing a felony punishment for certain bank officers of insolvent banks if its condition was fraudulently brought about by such officers. It made proof of certain enacted facts prima facie evidence of such fraudulent procurement, all of which are set out in the opinion, and it was held invalid because such enacted prima facie facts violated the rule supra, and in doing so the court said, inter alia:

"State legislation declaring that proof of one fact or a group of facts shall constitute prima facie evidence of the main or ultimate fact in issue is valid if there is a rational connection between what is proved and what is to be inferred . . . Mere legislative fiat may not take the place of fact, in the determination of issues involving life, liberty or property. 'It is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime.' "

The case of State v. Grimmet, 33 Idaho, 203, 193 P. 380, 382, is very much in point. It involved a statute relating to stealing of cattle, and required that every person slaughtering an animal should retain its hide for thirty days thereafter, and made the failure to do so prima facie evidence of the theft of the slaughtered animal by the one who failed to preserve the hide as required by the statute. In denouncing and annulling such declared prima facie effect, attempted to be given

by the statute to such omission, the Supreme Court of that state, inter alia, said:

"The act of a person in disposing of the hide of an animal within 30 days after it has been slaughtered by him is an act innocent in itself, except as made otherwise by statute. It may be necessary in the face of a falling market in order to prevent financial loss. It does not tend to prove that the animal slaughtered belonged to some one else or that it had been stolen. . . . Under this statute one could be convicted without any evidence that any cattle of any description had been stolen from any person. The instruction, if followed by the jury, relieved the state from the necessity of offering any evidence of the corpus delicti. . . . 'The presumption of innocence is an absolute protection against conviction and punishment either (1) on confession in open court, or (2) on proof which places guilt beyond a reasonable doubt.' Cooley's Const. Limitations (7th Ed.) p. 439. The Legislature may not enact directly that a defendant shall be deprived of the presumption of his innocence and required to assume the burden of proving that a crime has not been committed, or that he was not connected therewith. The Legislature cannot indirectly accomplish the same result by enacting that proof of a fact which has no rational tendency to prove that the defendant is guilty of committing a certain crime shall be prima facie evidence thereof, and thus in effect require him to assume the burden of proving his innocence."

To the same effect is the text of volume 2, page 149, of Jones' Commentaries on the Law of Evidence, wherein it is said: "The limitations (on the power of the legislature to enact such statutes) are that the fact upon which the presumption is to rest must have some fair relation to, or natural connection with, the main fact. The inference of the existence of the main fact, because of the existence of the fact actually proved, must not be merely and purely arbitrary," etc. Other authorities might be added to the list, but we deem it unnecessary, since the principle contended for is well settled and firmly established in the law.

Applying it to the statute under consideration we find that, if the accused (buyer of any such articles) is shown not to have complied "with one or more of the requirements," then the prima facie presumption against him arises. Substantially stated they are: (a) That he shall take from the seller a written statement which shall contain certain specified facts and which shall be sworn to; (b) that he shall indorse thereon whether the seller is personally known to him, and, if not so known, then he shall procure a sworn statement "from some reputable person" who does know the seller, containing certain facts and which reputable person the buyer knows; (c) that he must then indorse such statements and say therein whether or not he personally knows the seller, or, if not, that he personally knows the identifier (reputable person) of the seller; (d) that he must then cause the article purchased to be placed "unmingled with any other property" in a container and to remain there for fifteen days; (e) that he shall plainly mark such containers "with a separate and individual number;" (f) that he shall store the containers at his place of business, if he has one in this state, but, if not, at some other place in the state provided for that purpose; (g) that he shall write on the statement of the seller and the identification affidavit of the reputable person the number of the container in which the purchased article is deposited, with a description and location of his premises whereon the container is located; (h) that not later than the next Saturday following his purchase he shall transmit, in person or by registered mail, such writings with his statements and indorsements to the sheriff of the county where they are to be kept as public records and subject to inspection at all reasonable hours of the day by any one whomsoever; (i) that he shall permit the sheriff or any of his deputies, or the prosecuting attorney of the county "or any person interested in such articles," to come upon his premises "at any time" for the purpose of searching for and inspecting each article or articles throughout the fifteen days that he is required to keep them in his containers, and, if he should violate *any* of the above requirements, he is guilty of a misdemeanor and subject to be punished by confinement in jail for not less than thirty nor more than ninety days, and

to pay a fine of not less than twenty-five nor more than one hundred dollars. So that, if he violates any of the intricate requirements of him, he is subjected to a misdemeanor punishment, and, in addition, to have the burden cast on him to disprove his guilt of the felony crime created by section 1 of the act. Surely, under the rule above discussed, it requires no argument to demonstrate that many, if not all, of the listed requirements have no relevancy whatever to establish the guilt of the buyer of any of the articles enumerated "with intent to defraud," so as to place the burden on him to prove his actual innocence; but which would be true if the prima facie presumption attempted to be created by the act should be upheld. A reading of the cases supra, and especially the Idaho opinion, will conclusively demonstrate that the Legislature exceeded its powers in the respects now under consideration, and we will not lengthen this already too long opinion with further elaboration.

Attack (3) upon the validity of the 1930 act is founded upon the fact that it is in violation of section 10 of our Constitution, and which we conclude is equally as meritorious as either of the two hereinbefore discussed. The only authorities cited by learned counsel for defendants in avoidance of the attack on the involved provision in the statute are annotations in 30 A. L. R. 1427, and the case of Mansbach Scrap Iron Co. v. City of Ashland, 235 Ky. 265, 30 S. W. (2d) 968; but in neither of them was the question now under consideration involved, nor was it discussed or determined. It certainly requires no citation of authority to support the proposition that a statute enforcing searches of the nature embraced in section 10 of our Constitution against the will or consent of the one whose property or premises are searched is in direct violation of that section of the Constitution. Not a line in any of the cases cited in the annotation relied on, nor a line of the annotator, deals with the question here presented, nor did this court's opinion touch it, much less determine it, in the Mansbach case. At most, all that was done in that opinion by a divided court was to uphold an ordinance requiring an advance consent by a junk dealer that his premises might be so searched as a condition precedent to the granting of a license to him to operate his business.

The junk dealer, when confronted with such a situation as was presented in that case, could exercise his

choice to consent to the requirement in order to obtain the license to continue his business, or he could abandon it and embark in some other business. But here he is confronted with no such right of choice. On the contrary, the edict of the attacked statute is that his already going business shall be subject to the searches (though designated in the statute "inspections"), at any time of day, not only by officers, but also by "any person interested in such articles." The character of interest of any such persons is not pointed out, and the terms employed are broad enough to include sight-seers, the curiously inclined, prospective purchasers, possible owners, possible lienholders, or those moved by any other cause that interests the individual inspector. Moreover, if the authorities relied on by defendants' counsel could be made applicable to strictly *junk* dealers, they certainly would not apply in the case of the *individual* purchaser of such articles for household, domestic, or other purposes, whom the statute also includes, and to whom its drastic requirements are applicable just as much as to strictly junk dealers, as is hereinbefore pointed out. Without elaboration we conclude that this attack is also meritorious.

In view of the foregoing conclusions, and of what has already been said in this opinion, it becomes unnecessary to either discuss or determine the merits of attacks (4) and (5) or an additional one, not enumerated by us that the requirement that no purchase shall be made from a minor of any of the articles mentioned in the statute is fatal to its validity. Suffice it to say that our investigation convinces us that attack (4) is apparently meritorious, but, in view of our above expressed conclusions that the 1930 act is invalid for the reasons stated, we will pass without the expression of an opinion other attacks and arguments made in brief of learned counsel for plaintiffs, including numbers (4) and (5), as herein classified.

In conclusion we feel that it should be said that it would be difficult to find a statute more drastic in its imposed regulatory terms than the one here involved, or one containing more insidious innovations upon the rights of the populace, both as guaranteed by the Constitution and inherent in our civilized society, some of which we have discussed in this opinion, but others of which have not been mentioned.

Wherefore, the judgment is reversed, with directions to set it aside and to overrule the demurrer to the petition as amended, and for proceedings consistent with this opinion.