Steve ASHTON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 18, 1965.

Certiorari Granted Jan. 17, 1966.

See 86 S.Ct. 537.

Dan Jack Combs, Pikeville, Ephraim London, New York City, for appellant.

Robert Matthews, Atty. Gen., John B. Browning, Asst. Atty. Gen., Frankfort, Tolbert Combs, Commonwealth Atty. for Perry County, Hazard, for appellee.

CLAY, Commissioner.

Appellant was convicted of the *common law crime of criminal libel* and his punishment fixed at six months in jail and a $3,000 fine. The principal ground urged for reversal is that the nature of the offense was so "vague" and "inclusive" that appellant's conviction violated his constitutional rights of freedom of speech and due process.[1] This raises a novel and serious question which we will dispose of first.

The charge in the indictment is as follows:

"On or about the 22nd day of March, 1963, in Perry County, Kentucky, the above named defendant committed the offense of criminal libel, by publishing a false and malicious publication which tends to degrade or injure Sam L. Luttrell, Charles E. Combs, Mr. and Mrs. W. P. Nolan, against the peace and dignity of the Commonwealth of Kentucky."

Sam Luttrell was the chief of police of Hazard, Kentucky; Charles Combs was the sheriff; Mr. and Mrs. Nolan edited a local newspaper. The alleged defamatory matter appeared in a printed pamphlet entitled "Notes on a Mountain Strike", which was written by the defendant. He was a college student from Ohio who had come to Hazard to help unemployed miners in that area. This was a time of serious unrest in Perry County.

Although defendant raises some question about it, there is no doubt that the evidence proved "publication" of this pamphlet. The proof further establishes, and defendant admits, that certain statements therein, referring to the chief of police and the sheriff, were defamatory per se and were false. Though defendant contends the statements made about Mrs. Nolan (Mr. Nolan is not involved) were true, there was sufficient evidence that the statements accusing her of a breach of trust in the distribution of certain funds were in essence false.

By instructions to the jury the trial court made a most commendable effort to identify the crime more fully than was done in the indictment. To convict, the jury was required to find the defendant "did unlawfully publish * * * certain libelous and defamatory matter" which was "false and libelous, and was so known to be false and libelous when published by the defendant, and was written and published by him solely and for the purpose of bringing (the complaining witnesses) into great contempt, scandal, infamy and disgrace, and for the purpose of injuring, scandalizing and vilifying the name and reputation (of the complaining witnesses) * * *."

The court further instructed "that criminal libel is defined as any writing calculated

---

1. Under the first and fourteenth amendments to the United States Constitution.

to create disturbances of the peace, corrupt the public morals, or lead to any act, which, when done, is indictable"; and that "malice" was "an essential element of the offense". The jury was also advised that truth of the statements was a complete defense. These instructions were in fact so comprehensive in detailing different aspects of the crime (although omitting a definition of "malice") as to be somewhat confusing. However, defendant claims no specific error in the instructions.

The basic contention is that the case law of Kentucky does not adequately define the crime, and the trial court's attempt to delineate its elements was so vague, multifarious, and indefinite, and so inclusive of innocent acts, that the law lacks certainty with respect to the conduct condemned. Therefore, it is argued the conviction of the defendant deprived him of both the right of free speech and due process of law.

We will assume, although as far as we can discover after exhaustive research no case as decided this particular point, that the same certainty required of a criminal statute applies to a *common law crime.* See Sullivan v. Brawner, 237 Ky. 730, 36 S.W.2d 364; Roberts v. United States, 6 Cir., 226 F.2d 464; Winters v. People of State of New York, 333 U. S. 507, 68 S.Ct. 665, 92 L.Ed. 840; American Communications Association, CIO v. Douds, 339 U. S. 382, 70 S.Ct. 674, 94 L.Ed. 1391.

It is true that the offense of criminal libel has been subjected to stress and strain through its long period of development since the existence of the Court of the Star Chamber in England around the year 1600.[2]

A distinction was then recognized between defamation of a private person and a public official (which has continued to this day). With respect to the former, the real offense was the tendency of defamatory words *to incite a breach of the peace.* Where a public official was involved, criminality consisted of the *scandalous attack upon the government.* This latter was *seditious* libel, a political offense,[3] and most prosecutions for criminal libel in the United States seem to reflect shadows of this long since discredited ground of criminality.

It has been roundly questioned whether there ever was actually a *common law* crime of seditious criminal libel in England,[4] or if so, whether it survived the first amendment to the federal constitution.[5] In any event, it is certain that the English crime, as such, was not imported into the United States. This conclusion is inescapable when we consider the elements of the English crime, which constitutions, statutes and court decisions have substantially modified. One could be guilty of criminal libel under the English law without a showing of (1) malice, (2) falsity, or (3) publication, and (4), without a jury's finding the published matter was libelous. That was the status of the so-called common law criminal libel of England when written constitutions were adopted in the United States. It was against this background that the right of freedom of speech was recognized.

The first amendment to the Constitution of the United States provides that: "Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *."

2. The historical background hereafter given was taken principally from an article entitled Constitutionality of the Law of Criminal Libel, 52 Columbia Law Review 521 (1952), and an article, Seditious Libel; Myth and Reality, by Ervin Brandt, 39 New York University Law Review 1 (1964). Other texts examined have been Odgers on Libel and Slander (6th Ed.), and Newell, Slander and Libel (4th Ed.).

3. See Plucknett, A Concise History of the Common Law (5th Ed.) page 489.

4. Seditious Libel; Myth and Reality, by Ervin Brandt, 39 New York University Law Review 1 (1964).

5. Mr. Justice Holmes, dissenting, in Abrams v. United States, 250 U.S. 616, 630; concurring opinions of Justices Douglas, Black and Goldberg in Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; Emerson, Toward a General Theory of the First Amendment, 72 Yale Law Journal 877, 924 (1963).

Section 1 (subsection four) of the Kentucky Constitution recognizes as an inalienable right of all men: "The right of freely communicating their thoughts and opinions."

Section 8, Kentucky Constitution, provides in part: "Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty."

Section 9, Kentucky Constitution, provides: "In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libel the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases." [6]

The above passages clearly show that both federal and state governments were attempting in some manner to escape the abuses of criminal libel prosecutions in England when they were written into American constitutional law. Also, with adoption of these provisions, emphasis shifted from the protection of political institutions to the protection of the individual's right of free expression. As an original proposition it would have been neither difficult nor unreasonable for the courts of this country thereafter to conclude that the common law crime of criminal libel had not survived our federal and state constitutions. There is respectable authority for that view even today.[7]

However, the fact remains that the crime of criminal libel is recognized and enforced throughout the United States. While many states have made the offense a statutory crime, the courts of those states which have not legislated on the subject have acknowledged the existence of the crime in its common law form.[8] In the only two cases we have found where the question was squarely presented as to whether the common law crime survived in the United States, the answer, after careful consideration, was in the affirmative. Commonwealth v. Whitmarsh (Mass.1836), Thacher's Criminal Cases (page 441), and Commonwealth v. Chapman, 54 Mass. (13 Metcalf) 68 (1847).

■ In Kentucky, as heretofore noted, section 9 of the Constitution refers to "indictments for libel". Section 132 of the Criminal Code dealt with such indictments. In at least six Kentucky cases this Court has recognized the common law crime. Tracy v. Commonwealth, 87 Ky. 578, 9 S. W. 822 (1888); Smith v. Commonwealth, 98 Ky. 437, 33 S.W. 419, 17 Ky.Law Rep. 1010 (1895); Browning v. Commonwealth, 116 Ky. 282, 76 S.W. 19 (1903); Commonwealth v. Duncan, 127 Ky. 47, 104 S.W. 997 (1907); Yancey v. Commonwealth, 135 Ky. 207, 122 S.W. 123 (1909); Cole v. Commonwealth, 222 Ky. 350, 300 S.W. 907 (1927). It is significant that in none of those cases did the defendants question the nature of the crime or the certainty of the elements of which it consisted. While the same questions were not involved in each case, and while in none of them do we find a comprehensive definition of criminal libel, they jointly recognize its four basic

6. This section of the Kentucky Constitution incorporated the two important provisions of Section 3 of the Federal Sedition Act of 1798, 1 U.S.Stat. 596, 597, which stemmed from the English Fox Libel Act of 1792, 32 Geo. 3, Ch. 60. The provision with respect to jury function did not effect any change in the mode of jury trial. Walston v. Commonwealth, Ky., 106 S.W. 224, 32 Ky.Law Rep. 535.

7. See the concurring opinions of Mr. Justices Douglas, Black and Goldberg in Gar-

rison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; Irvin Brandt, Seditious Libel; Myth and Reality, 30 New York University Law Review 1; Emerson, Toward a General Theory of the First Amendment, 72 Yale Law Journal 877, 924.

8. Beauharnais v. People of State of Illinois, 343 U.S. 250, 265, 72 S.Ct. 725, 96 L.Ed. 919.

elements: (1) written words which are defamatory per se, (2) publication, (3) falsity, and (4) malice.

Some of these cases made reference to another aspect of the crime which defendant contends contributed to the vagueness and uncertainty of the law. This was the tendency of the defamatory words to lead to a "breach of the peace". In the Tracy case it was said "[t]he publication is, in effect a breach of the peace". In the Duncan case it was said that the publication "was manifestly calculated to create a disturbance of the public peace". In the Browning case it was said "the publication amounts to an indictable offense, inasmuch as it tends to provoke violence and disturb the peace of society". In Provident Sav. Life Assur. Soc. v. Johnson, 115 Ky. 84, 72 S.W. 754 (1903), a civil suit for malicious prosecution for criminal libel, it was said "[a] criminal libel is committed by any writing calculated to create disturbance of the peace, corrupt the public morals, or lead to any act which, when done, is indictable".

It is defendant's contention that to define the crime in terms of its tendency to cause a "breach of the peace" or lead to an indictable act is too indefinite to identify criminal conduct. There are two answers to this argument.

■ In the first place, the quoted statements from our cases simply refer to the *nature of the writing* which would constitute the basis of the charge of criminal libel. In those cases it was assumed that words which were defamatory per se were sufficiently offensive to be criminally libelous, provided the other elements of the crime were established. In those cases, as *in the one before us, there was no issue* concerning the defamatory nature of the published matter. Consequently the possible uncertainty of the concepts of "breach of the peace" or "indictable offense", as descriptive of the nature of defamatory matter, does not unstabilize the essential elements of the offense with which defendant was charged.

■ In the second place, in the development of the common law of criminal libel in the United States the offense is no longer founded, as it once was in England, upon the tendency of the defamatory words to cause a "breach of the peace" or to induce others to commit a public offense.

It has been observed:

"Whatever validity the former ground—keeping the peace—had historically was 'rejected with finality (over) fifty years ago.' Originally, criminal libel laws emphasized the state's concern with the prevention of sedition and turbulence. Even later expansion to ordinary or nonpolitical defamation could be explained as an effort to provide a substitute for the self-help remedy of the duel. After the passing of the custom of dueling, the common-law development could no longer be justified in terms of the interest in preservation of peace. Once truth was recognized as a complete defense, at least in the civil action, it was perfectly clear that the interest being served was no longer keeping of the peace." [14]

The erosion of the "breach of the peace" justification for criminal libel laws was recognized in Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. See also Emerson, Toward a General Theory of the First Amendment, 72 Yale Law Journal 877, 924 (1963).

■ In fact the ancient broad common law concept of what constituted a "breach of the peace" is no longer a constitutional basis for imposing criminal liability. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Garner v.

14. Libel and the First Amendment—A New Constitutional Privilege, by Arthur

L. Berney, 51 Virginia Law Review 1, 40 (1965).

State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207. See also Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed. 697; Henry v. City of Rock Hill, 376 U.S. 776, 84 S.Ct. 1042, 12 L.Ed.2d 79; Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed. 471; Constitutionality of the Law of Criminal Libel, 52 Columbia Law Review 521, 528 (1952).

None of our Kentucky cases based the criminality of the act upon the tendency to cause a "breach of the peace" or the commission of an "indictable offense". To the extent they defined the defamatory nature of the words in these terms, they are obsolete. In our latest case on the subject, Cole v. Commonwealth, 222 Ky. 350, 300 S.W. 907 (1927), which perhaps came closer to defining the crime than any of our other opinions, no mention is made of the possibility of public disturbance which might be incited by the publication.

■ We conclude, therefore, that defendant cannot fairly claim that an outmoded aspect of the impact of the defamatory words made uncertain the kind of conduct for which he was prosecuted and convicted.

■ As we have heretofore indicated, the common law crime of criminal libel recognized in Kentucky is basically the publication of a defamatory statement about another which is false, with malice. There is no uncertainty in the law about what constitutes (1) publication, (2) defamatory words, or (3) falsity. There is a certain indefiniteness concerning the nature of malice but we find this difficulty with that term throughout the criminal law.[15]

■ In Riley v. Lee, 86 Ky. 603, 11 S. W. 713, 11 Ky.Law Rep. 586, malice was defined as the intentional publication of defamatory matter "without justifiable cause". This was a civil suit but it is a

broad description of the mental state which constitutes actual malice in criminal libel. Wharton's Criminal Law and Procedure (Anderson's Edition), Vol. 2, section 879 (page 745); 33 Am.Jur., Libel and Slander, section 312 (page 249). The last cited authorities used the words "without legal (or lawful) justification or excuse". The definition in these terms is not very helpful because it leads us into a vast field of what constitutes justification or excuse.

A more workable analysis appears in Smith v. Commonwealth, 98 Ky. 437, 33 S.W. 419 (1895). That case involved the question of whether the jury should be instructed to find "malice". The Court held an instruction proper without use of this term when the jury was required to find that the publication was false and libelous and was "written and published by (defendant) solely and *for the purpose* of bringing the (prosecuting witness) into great contempt, scandal, infamy and disgrace". (Our emphasis)

The United States Supreme Court has recently added an additional measure of malice in a criminal libel case where the defamatory words concern public officers and public affairs (which we have in the present case). In Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed. 2d 125, it was held that the state could not impose criminal sanctions for criticism of official conduct of public officials, even though false, unless the defamatory words were published "with knowledge of their falsity or in reckless disregard of whether they are true or false". This added another dimension to malice, although serious questions arise concerning its practical utility and proper application.[16] There is still an area of inevitable uncertainty in pinpointing the evil intent within the scope of the term.

We may point out that defendant does not contend the element of "malice" is so

---

15. Mens Rea, 45 Harvard Law Review 974.

16. New York Times Co. v. Sullivan—The Scope of a Privilege, 51 Virginia Law Review 106.

vague, or uncertain, or inclusive as to make unconstitutional his prosecution or conviction for criminal libel. We have discussed this matter because it has given us some concern and because it is significant on the next contention made by defendant.

It is argued there was no *evidence* offered to show that defendant's defamatory statements were made with "actual malice". That is what New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 95 A.L.R.2d 1412, 11 L.Ed.2d 686, and Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L. Ed. 125, apparently require. However, neither of those cases required *independent* proof of malice. Obviously, unless the defendant had told someone of an evil motive or had voluntarily taken the stand and so testified, actual malice could be proved only as a state of mind made manifest by the nature of the defamatory words and the circumstances surrounding their publication. New York Times and Garrison do require the establishment of actual malice (i. e., a calculated falsehood), by proof rather than presumption, but they lay down no constitutional standards with respect to the *sufficiency* of proof (although New York Times considered the question of sufficiency).

■ As we have intimated, if the defendant has not stated his motives to another person or has not taken the stand as a witness (as here), it is a practical impossibility to prove his knowledge, or reckless disregard of the truth, or his intent, or his purpose (all of which are subjective) except as a permissible inference which may reasonably be drawn from his particular conduct. Malice may be proved by circumstantial evidence as any other fact. Combs v. Commonwealth, Ky., 356 S.W.2d 761.

■ In the present case the defendant was a stranger in the community. He was not acquainted with the prosecution witnesses. He had not personally confronted

them with their claimed misconduct. Some of the statements made about them were clearly defamatory and they were false. This was a period of strife between union and non-union miners, and the defendant and the prosecuting witnesses were in opposing camps. From all these facts a jury, not necessarily but reasonably, could conclude that the defendant was motivated by actual malice: that is, he knowingly or in reckless disregard of the truth published these false statements for the purpose of exposing the prosecuting witnesses to public degradation.

■ It may be noted that the trial judge by his instructions required the jury to find malice in substantially these terms. Actually the instructions were more favorable to the defendant than the law required. The jury was required to find the defamatory matter was "known to be false", even though a reckless disregard of the truth would have carried the same imputation of wrongful conduct. The jury was also required to find that the defamatory matter was published "*solely* and for the purpose of" bringing the complaining witnesses into public degradation. This language was taken from Smith v. Commonwealth, 98 Ky. 437, 33 S.W. 419 (1895). It is not only ungrammatical but would seem to excuse the defendant if he could show some collateral purpose influencing his conduct. While we disapprove of the use of the word "solely" in the instruction, its inclusion favored the defendant. On this point we must conclude that the evidence, even though circumstantial, was suficicient to support a jury finding of actual malice.

■ It is next contended the indictment was fatally defective in that it did not set forth facts sufficient to constitute a criminal offense. The indictment is quoted at the beginning of this opinion. From our discussion of other problems arising in this case, it is apparent this indictment in substance sets forth all of the essential elements of criminal libel. It certainly conforms with the requirements of RCr 6.10(2).

■ Under RCr 6.22 defendant moved for a bill of particulars, which motion was denied. This was error. At least defendant was entitled to an accurate copy of the alleged libelous matter. Prior to the adoption of our new criminal rules, apparently this would have been an essential part of the indictment. Roberson's New Kentucky Criminal Law and Procedure, 2d Ed., section 1186 (page 1404). However, the denial of this motion was not prejudicial. There is no suggestion defendant was not fully aware that he was being prosecuted for the libelous matter, concerning the specifically named prosecuting witnesses, which appeared in "Notes on a Mountain Strike", or that he did not have a copy of this printed material. Defendant insists he was entitled to know "in what manner it was claimed publication was made" but this is quibbling over a relatively unimportant matter. We cannot find the denial of defendant's motion in any way prejudiced his defense.

The final contention is that the verdict was concurred in by only 10 members of the jury and was void because in violation of RCr 9.82 and RCr 9.88, which require a "unanimous" verdict. It is admitted by defendant that he voluntarily consented to a majority verdict before it was rendered. It is claimed, however, that such consent or waiver violates the "ancient mode of trial by jury" (Section 7, Kentucky Constitution) and public policy.

The only answer of the Commonwealth to this argument, in its brief, is that since the record fails to show otherwise, we must presume the verdict was unanimous. We will assume, however, that only 10 of the 12 jurors agreed upon the verdict.

Clearly defendant would have been bound by an agreement to honor the verdict of a 10-man jury. KRS 29.015 specifically authorizes the parties in a misdemeanor case to agree on a trial by a lesser number of persons than 12. The offense with which defendant was charged was a misdemeanor (KRS 431.060).

At first blush it would seem that if a defendant "may agree to a trial by a lesser number of persons" than 12 (KRS 29.015), an agreement to accept a verdict of the majority of a panel of 12 conforms with the statute. It is contended, however, that regardless of the number of jurors, the verdict of that specific number must be *unanimous*, as RCr 9.82(1) and RCr 9.88 provide.

Such view was taken in Hibdon v. United States, 6 Cir., 204 F.2d 834, wherein the court followed two lines of reasoning. It was first held that because of the mandatory phrasing of Federal Criminal Rule 31(a), which is substantially the same as RCr 9.82, the requirement of unanimity could not be waived. We are not inclined to accept this conclusion. A vast number of both civil and criminal procedural rules are mandatory in form, but unless they are jurisdictional in nature, or noncompliance will adversely affect the administration of justice, no reason is apparent why a party cannot understandingly and voluntarily waive their requirements.

The second line of approach in Hibdon was that under the ancient common law the defendant's guilt had to be proved beyond a reasonable doubt in order to overcome the presumption of innocence, and a verdict of only a majority of the jurors would not meet that requirement since a dissenting vote would demonstrate the existence of a reasonable doubt. It was suggested that unless the court upheld this high standard upon which a conviction could be based, the prosecutor would have a lesser burden of proof and there might result unjust convictions. Assuming these speculations have some validity, the risk is one which the defendant voluntarily accepts.

The substance of the Hibdon opinion relating to the sacredness of a jury trial was keyed to a "humanitarian concept" and "due process". Emphasis was placed upon the historical background and the public interest in the protection of persons accused of crime. In our opinion the reasons making necessary extraordinary solicitation

for the defendant's rights have long since disappeared. It will be remembered that under the common law the accused could not testify in his own behalf, he had no right to counsel, and the penalties were extremely severe, usually death. In Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, it was pointed out the ancient doctrine that the accused could waive no rights was based upon those early conditions. Noting that they no longer exist, the United States Supreme Court decided the accused could waive a 12-man jury and properly agree to be tried by 11 jurors.

The Hibdon opinion sought to distinguish the Patton case and to distinguish between waiving the number of jurors and waiving unanimity. Accepting the latter distinction, we simply cannot find a persuasive reason for a different application of the waiver principle. We will take leave of Hibdon with the observation that the ultimate decision was based on an acceptable ground, i. e., the defendant was coerced into the agreement and therefore it was not voluntarily made. The preliminary conclusions in that opinion which we have discussed fall into the category of dictum. This does not condemn the reasoning but we are not inclined to follow it.

We think the time has come to abandon the romantic aspects of the ancient mode of trial by jury and consider the matter pragmatically. No one questions the right of a defendant in a criminal case to invoke the protection of any or all of his constitutional rights. On the other hand, we can find no sound reason to deny him the right of waiving procedural requirements which exist principally for his benefit. We have recognized that he can waive a jury completely by pleading guilty. He can waive the right to counsel, the right to freedom from self-incrimination, the right to have excluded evidence obtained by unreasonable search or seizure, and at least in misdemeanor cases, the right to a 12-man jury. On what logical basis is unanimity a more sacred right?

It is true this Court has heretofore adhered to the theory that in *a felony case* the defendant cannot waive a 12-man jury. Branham v. Commonwealth, 209 Ky. 734, 274 S.W. 489; Tackett v. Commonwealth, Ky., 320 S.W.2d 299. A serious question may be raised as to whether a valid distinction can be made between the waiver of defendant's rights in felony cases on the one hand and misdemeanors on the other. See Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854; Waiver of Trial Jury in Felony Cases in Kentucky, 48 Ky.L.Journal 457. We do not have that question here and will not re-examine it.

It is our conviction that at least in misdemeanor cases the defendant may waive not only a 12-man jury but unanimity of the jurors in reaching their verdict, provided always that such waiver agreement is entered into *understandingly* and *voluntarily*, and provided of course the Commonwealth agrees and the trial court approves. Since no suggestion is made that the defendant in this case did not understandingly and voluntarily enter into the agreement to accept a majority verdict (and our solicitude for the rights of the defendant can be maintained by careful scrutiny of these two conditions), he was bound by his agreement. We find no error here.

We have considered carefully each of the six points raised in appellant's brief and find no reversible error.

The judgment is affirmed.

MOREMEN, C. J., and STEWART and MILLIKEN, JJ., dissent on the ground that since the English common law of criminal libel is inconsistent with constitutional provisions, and since no Kentucky case has redefined the crime in understandable terms, and since the law must be made on a case to case basis, the elements of the crime are so indefinite and uncertain that it should not be enforced as a penal offense in Kentucky.