**BOARD OF TRUSTEES OF THE JU-DICIAL FORM RETIREMENT SYSTEM, Appellant,**

v.

**ATTORNEY GENERAL OF THE COMMONWEALTH OF KENTUCKY, Appellee.**

and

**Board Of Trustees Of The Kentucky Retirement System, Appellant,**

v.

**Attorney General Of The Commonwealth Of Kentucky, Appellee.**

No. 2002–SC–0699–DG, 2002–SC–0700–DG.

Supreme Court of Kentucky.

Oct. 23, 2003.

Rehearing Denied May 20, 2004.

James T. Gilbert, Coy, Gilbert & Gilbert, Richmond, Counsel for Appellant Board of Trustees of the Judicial Form Retirement System (2002–SC–0699–DG).

William P. Hanes, J. Eric Wampler, James Dodrill, Kentucky Retirement Systems, Perimeter Park West, Frankfort, Counsel for Appellant Board of Trustees of

the Kentucky Retirement System (2002–SC–0700–DG).

A.B. Chandler, III, Atty. Gen., State Capitol, D. Brent Irvin, Asst. Atty. Gen., Civil & Environmental Law Division, Office of the Attorney General, Jennifer L. Carrico, Asst. Atty. Gen., Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee Attorney General of the Commonwealth of Kentucky (2002–SC–0699–DG and 2002–SC–0700–DG).

COOPER, Justice.

This appeal involves the validity of House Bill (HB) 389(4) which amended a provision of the Judicial Retirement Act, KRS 21.450(3). It presents three questions: (1) whether the amendment fails because of the legislature's failure to obtain an actuarial analysis to accompany the amendment in accordance with KRS 6.350; (2) whether the amendment is unintelligible and thus void for vagueness; and (3) whether by virtue of its vagueness, the amendment constitutes an unconstitutional delegation of legislative power to the executive branch. While not in violation of KRS 6.350, the amendment's vagueness is fatal under the latter two questions.

As amended, KRS 21.450 now reads (amendatory language emphasized):

(1) The benefits provided by KRS 21.350 to 21.510 to be paid shall be funded through contract with a reputable life insurance company authorized to do business in this state, or through investment and reinvestment of funds in securities which, at the time of making the investment, are by law permitted for the investment of funds by fiduciaries in this state, or through a combination of such methods. To the extent that funding is provided through insurance contract, no contributions, payments or premiums shall be subject to any tax on insurance premiums or annuity considerations. The investment committee for the judicial retirement fund shall be trustee of any and all funds contributed or appropriated to the retirement system, and shall have sole authority to make insurance contracts or investments.

(2) The board members or any investment adviser shall discharge their duties with respect to the funds of the retirement system solely in the interest of the members and beneficiaries and:

(a) For the exclusive purposes of providing benefits to members and their beneficiaries and defraying reasonable expenses of administering the plan;

(b) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and

(c) In accordance with the laws, regulations and other instruments governing funds.

*(3) Any accrual of benefits provided under this or any other applicable statute shall be no less than the benefit adjustment provided for in KRS 21.405(4) from the date of the last establishment of that benefit.*

The "benefit adjustment provided for in KRS 21.405(4)" is an annual cost-of-living increase of judicial retirement benefits based on the Consumer Price Index (CPI), not to exceed five percent. Since KRS 21.450 does not contain an "accrual of benefits" provision, the "benefit adjustment" must refer to benefits awarded under "any other applicable statute." That "applica-

ble statute" could not be a statute similar to KRS 21.450 because there is no statute pertaining to the funding of retirement benefits or the duties of a retirement board of trustees or investment adviser that contains an "accrual of benefits" provision. *See* KRS 21.440; KRS 21.530; KRS 21.540; KRS 21.550; KRS 21.560; KRS 61.570; KRS 61.645; KRS 61.650; KRS 61.660.

The Board of Trustees of the Judicial Form Retirement System (JFRS) administers both the Judicial Retirement Plan described in KRS 21.345, *et. seq.,* and the Legislators' Retirement Plan, KRS 6.500, *et seq.* KRS 21.530 provides:

> *For administrative purposes only,* as hereinafter provided, the Legislators' Retirement Plan and the Judicial Retirement Plan shall be coordinated under the name, Judicial Form Retirement System, *but each of the plans shall maintain its separate identity.*

(Emphasis added.)

However, "any other applicable statute" providing an "accrual of benefits" could not refer to a statute pertaining to actual judicial or legislative retirement benefits because KRS 21.405(4) and KRS 6.521(2) already apply annual CPI increases to those benefits. Instead, Appellant asserts that the "other applicable statute" is KRS 61.510(13), a section of the Kentucky Employees Retirement System (KERS) which does not purport to provide for an "accrual of benefits" but only defines "creditable compensation" of KERS members as "salary, tips ... and fees" for purposes of calculating their retirement benefits under KRS 61.595, *et seq.,* and "for members of the General Assembly, it [creditable compensation] shall mean an assumed salary of twenty-seven thousand-five hundred dollars ($27,500) per annum ...." Appel-

lant claims this "assumed salary" is the "accrual of benefits" to which the CPI increases in HB 389(4) apply—retroactively to 1982, "the date of the last establishment of" the assumed salary and prospectively after July 14, 2000, the effective date of HB 389(4). Retroactive application of CPI increases from 1982 through 1999 would increase the "assumed salary" by 72% from $27,500.00 to $47,308.00.

The significance of KRS 61.510(13) is that KRS 6.520(1) calculates a legislator's initial retirement benefit by multiplying 3.5% of the legislator's "final compensation" times the legislator's years of service and defines "final compensation" as the "creditable compensation" defined in KRS 61.510(13). A 72% increase in the "assumed salary" would, therefore, translate into a concomitant 72% increase in a legislator's retirement benefits. For example, a legislator earning $27,500.00 and retiring after twenty years of service would be entitled to an annual retirement benefit of $19,250.00 before HB 389(4) (3.5% X $27,500.00 X 20 years) but an annual retirement benefit of $33,115.60 after HB 389(4) (3.5% X $47,308.00 X 20 years) even though the legislator never earned a salary in excess of $27,500.00.

This theory that the amendment of KRS 21.450 actually amended KRS 61.510(13) has three immediately apparent flaws. First, HB 389(4) refers to an "accrual of benefits *provided under* ... any ... applicable statute." (Emphasis added.) However, no "accrual of benefits" is "provided under" KRS 61.510(13); it merely identifies a legislator's "creditable compensation," which is but one factor used in calculating that legislator's initial retirement benefit. Second, the theory misapplies accrual of benefits to creditable compensation. "Accrual of benefits" means, in a

defined benefit plan,[1] "the process of accumulating pension credits for years of credited service, expressed in the form of an annual benefit to begin payment at normal retirement age." *Employment Benefit Plans: A Glossary of Terms, supra* note 1, at 1. Applying that definition, "accrual of benefits" pertains not to the retiree's "creditable compensation" but to the retiree's "service credits," *i.e.,* the retiree's years of creditable service, KRS 6.515, yet another factor used in calculating the initial retirement benefit. Clearly, annual CPI increases do not apply to allow the accumulation of additional "service credits." A third flaw in the theory is that HB 389(4) refers to the "last establishment of that benefit," and "creditable compensation," in the case of a legislator, is an assumed "salary," not a benefit.

## I. LEGISLATIVE HISTORY OF KRS 21.450(3).

*Senate Bill 349.*

On March 13, 2000, Senate Bill (SB) 349 was introduced and read on the Senate floor. 2000 Sen. J. 1544. As written, Section 1(13) of SB 349 would have read as follows:

> [F]or members of the General Assembly who retire under Section 12 of this Act, or who die in office, "final compensation" shall be forty-five thousand dollars ($45,-000). The assumed salary for legislators in this subsection shall be adjusted annually ... to reflect changes in the current purchasing power of the dollar. The maximum possible compensation for legislators under this subsection shall be

based precisely upon the consumer price index formula approved in *Matthews v. Allen*, Ky., 360 S.W.2d [135], 139 (1962). Thus, its sponsor clearly intended for SB 349 to increase the "assumed salary" of legislators from $27,500.00 to $45,000.00 and to provide for CPI increases of the assumed salary on an annual basis thereafter. An actuarial analysis dated March 10, 2000, presumably obtained in compliance with KRS 6.350, indicates that the increase of the "assumed salary" to $45,000.00 would have required $725,000.00 per year of additional funding for the JFRS. Letter from Gagel to Early of 3/10/00, at 3. When the tenor of the floor debate indicated that the proposed increases would fail, SB 349 was withdrawn and replaced by a committee substitute that retained the $27,500.00 "assumed salary" and did not provide for future annual CPI increases. 2000 Sen. J. 1590. The committee substitute then passed the Senate and was sent to the House where it was reported and received its first reading on March 24, 2000. 2000 House J. 4622. On March 27, 2000, a House floor amendment to SB 349 (committee substitute) was introduced that would have reinstated the amendments deleted by the Senate, *i.e.,* immediate increase of "assumed salary" to $45,000.00 with annual CPI increases thereafter. 2000 House J. 4909. The bill was never called to a vote and was recommitted to the appropriations committee from which it did not re-emerge. *Id.* at 5297.

*House Bill 389.*

Meanwhile, on March 13, 2000, the same day the original version of SB 349 was

---

1. The Legislators' Retirement Plan is a defined benefit plan because retired legislators are entitled to receive benefits based on a formula from a general retirement fund with no ownership right to an individually maintained retirement account. *See* KRS 6.520(1) (setting forth the formula for calculation of

benefits incorporating years of service). *See also Employment Benefit Plans: A Glossary of Terms* (Int'l Found. of Employment Benefit Plans 2000) 1 (describing "defined benefit plan" as involving "a definite formula by which the employees' benefits will be measured").

debated and withdrawn, HB 389 was passed by the House and sent to the Senate. This bill, as passed by the House, would have amended various unrelated provisions of the Legislators' and Judicial Retirement Plans, but not KRS 21.450. 2000 House J. 3359. It was first referred to the Senate Appropriations Committee, 2000 Sen. J. 2090, then to the State and Local Government Committee. *Id.* at 2926. On March 23, 2000, the latter committee adopted and added to the consent calendar by voice vote a committee substitute for HB 389 that deleted several sections and added a new section (4). Minutes, Sen. Comm. on State & Local Gov't (15th meeting, March 23, 2000). The Legislative Research Commission then requested that the executive director of the JFRS provide an actuarial analysis of all four sections of HB 389 (committee substitute). On March 27, 2000, the executive director responded that the impact of Sections 1 and 2 would be "zero," the impact of Section 3 would be "negligible," and "I am unable to determine the fiscal impact, if any, of Section 4." Letter from Early to Dutton of 3/27/00.

On March 29, 2000, HB 389 (committee substitute) passed the Senate without debate as part of the consent calendar. 2000 Sen. J. 3366. Later that same day, the House concurred with the Senate's committee substitute for HB 389 with only this comment by the House sponsor:

> Section 4 was added ... and I have a report here ... from the retirement system ... that says ... "I am unable to determine the fiscal impact, if any, of Section 4."

Videotape: House Floor Debate (3/29/2000); 2000 House J. 5229.

## II. PROCEDURAL BACKGROUND.

Unable to decipher what effect, if any, HB 389(4) might have on the JFRS, the executive director of the JFRS requested a formal opinion from the Attorney General, pursuant to KRS 15.025(1) as to the bill's proper interpretation and effect with respect to the following potential issues:

1. Does the amendment to KRS 21.450 require that the assumed salary in the Legislat[ors'] Retirement Plan be annually increased by the CPI?

2. If the amendment to KRS 21.450 provides that the assumed salary under the Legislat[ors'] Retirement Plan is to be annually increased by the CPI, is the increase retroactive?

3. If the amendment to KRS 21.450 provides that the assumed salary under the Legislat[ors'] Retirement Plan is to be annually increased by the CPI, at what date is the increase to be first applied?

4. Does the amendment to KRS 21.450 provide that in a year in which a judicial salary increase falls below the CPI, will the salary be adjusted by the CPI? If the amendment requires that a judicial salary be adjusted by the CPI, is the increase retroactive? If the amendment requires that a judicial salary be adjusted by the CPI, at what date is the increase to be first applied?

5. Is the legislator or judge required to make personal contributions on the additional assumed salary or salary on which the benefits ultimately will be calculated?

6. To whom does the amendment apply—members, retirees, or both?

OAG 00–5, at 2 (quoting the questions posed by the executive director of the JFRS).

In the course of drafting his response, the Attorney General requested that Senator Robinson, chair of the Senate State and Local Government Committee, provide any research or documentation uti-

lized in drafting the committee substitute for HB 389(4). Letter from Sen. Robinson to Carrico, 5/18/00, at 1 (referring to Attorney General's information request). By letter dated May 18, 2000, Senator Robinson responded that no such documents existed and gratuitously added that the intent of the bill was to increase legislators' retirement benefits by applying annual CPI increases to the "assumed salary" of legislators retroactive to 1982. He further explained:

> Since it was our intent to not make the provision of the amendment so visible; and based on staff's proposal, we decided to place the substance of our proposal on one of the judicial statutes that are identified with KRS 6.525. Therefore, we chose to peg our proposal to KRS 21.450.

*Id.* On June 13, 2000, the Attorney General rendered his opinion that HB 389(4) was void because it (1) was enacted without obtaining the actuarial analysis required by KRS 6.350; (2) is so vague as to be unintelligible; and (3) violates the "nondelegation doctrine" by delegating legislative authority to an administrative agency. OAG 00–5.

The Board of Trustees of the JFRS filed this action in the Franklin Circuit Court for a declaratory judgment pursuant to KRS 418.040, requesting that the court declare HB 389(4) valid and judicially construe its meaning. The Franklin Circuit Court accepted the theory that the amendment of KRS 21.450 actually amended KRS 61.510(13) and that its effect was to increase the "assumed salary" of legislators to $47,308.00 as of July 14, 2000, and to apply CPI increases to the assumed salary on an annual basis thereafter. The circuit court further concluded that HB 389(4) was unintelligible only to laypersons but understandable to pension law specialists (despite the fact that the executive director of the JFRS was unable to comprehend its meaning). The circuit court did not address the nondelegation doctrine despite conceding that only an expert could decipher the bill's meaning. Finally, the circuit court found substantial compliance with KRS 6.350 because the General Assembly had made an unsuccessful attempt to obtain an actuarial analysis from the executive director of the JFRS. KRS 6.350 provides, *inter alia:*

> A bill which would increase the benefits ... of any public retirement system ... shall not be reported from a legislative committee of either house of the General Assembly ... unless the bill is accompanied by an actuarial analysis ... show[ing] the economic effect of the bill on the public retirement system, including a projection of the annual cost to the system of implementing the legislation for at least ten (10) years ... prepared by an actuary who is a fellow of the Society of Actuaries, a member of the American Academy of Actuaries, or an enrolled actuary under the Employees' Retirement Income Security Act of 1974.

The Court of Appeals reversed the Franklin Circuit Court without addressing the vagueness and nondelegation issues, deeming KRS 6.350 mandatory and, thus, the failure to obtain the actuarial analysis fatal. Having granted discretionary review, we disagree with the Court of Appeals that the General Assembly's noncompliance with KRS 6.350 invalidates HB 389(4). However, we also disagree with the Franklin Circuit Court and find HB 389(4) unconstitutional because it is void for vagueness in that it is unintelligible and because it violates the nondelegation doctrine.

## III. ACTUARIAL ANALYSIS.

The Court of Appeals declared HB 389(4) invalid because the General As-

sembly failed to comply with KRS 6.350. However, that statute is procedural in nature and has no constitutional implications. Section 39 of our Constitution authorizes the General Assembly to establish rules governing its own proceedings. So long as those rules do not violate some other provision of the Constitution, it is not within our prerogative to approve, disapprove, or enforce them. *Cf. Philpot v. Patton,* Ky., 837 S.W.2d 491, 494 (1992) ("While it would be a violation of the separation of powers doctrine in the Kentucky Constitution, Sections 27 and 28, for our Court to tell the General Assembly what to do, i.e., what system or rules to enact, it is our constitutional responsibility to tell them whether the system in place complies with or violates a constitutional mandate, and, if it violates the constitutional mandate, to tell them what is the constitutional 'minimum.' "). While we have not previously addressed the issue, other courts that have done so have uniformly held that a statute enacted in contravention of a legislative procedural rule is not invalid *per se.*

> It is entirely the prerogative of the legislature, however, to make, interpret, and enforce its own procedural rules, and the judiciary cannot compel the legislature to act in accordance with its own procedural rules so long as constitutional questions are not implicated. Furthermore, the legislature has complete control and discretion whether it shall observe, enforce, waive, suspend, or disregard its own rules of procedure, and violations of such rules are not grounds for the voiding of legislation.

*Des Moines Register & Tribune Co. v. Dwyer,* 542 N.W.2d 491, 496 (Iowa 1996) (citations omitted). *See also Abood v. League of Women Voters,* 743 P.2d 333, 336–37 (Alaska 1987) (review of the legislature's adherence to its own procedural rules constitutes a nonjusticiable political question solely within the legislature's province, and non-adherence to rules does not implicate constitutional rights); *State v. Gray,* 221 La. 868, 60 So.2d 466, 468 (1952) (legislature's failure to observe procedural rules does not invalidate legislation). The result is the same even when the procedural rule is, as here, codified in a statute. *Moffitt v. Willis,* 459 So.2d 1018, 1021–22 (Fla.1984).

In *State ex. rel. La Follette v. Stitt,* 114 Wis.2d 358, 338 N.W.2d 684 (1983), the Wisconsin legislature enacted debt legislation in contravention of Wis. Stat. § 13.49(5) which required referral of such proposed legislation to a joint survey committee on debt management before passage. *Id.* at 686–87. The statute further provided that "[t]he proposal shall not be considered further by either house until the committee has submitted a report, in writing, setting forth an opinion on the fiscal effect upon the state or local government ...." *Id.* at 686 (quoting Wis. Stat. § 13.49(5)). This language, of course, closely resembles the mandatory language in KRS 6.350. In upholding the debt legislation, the Wisconsin Supreme Court noted:

> Courts are reluctant to inquire into whether the legislature has complied with legislatively prescribed formalities in enacting a statute. This reluctance stems from separation of power and comity concepts, plus the need for finality and certainty regarding the status of a statute. *Baker v. Carr,* 369 U.S. 186, 215, 82 S.Ct. 691, 709, 7 L.Ed.2d 663 (1962). Although since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) courts have had the authority to review acts of the legislature for any conflict with the constitution, courts generally consider that the legislature's adherence to the rules or statutes prescribing procedure is a matter entirely within legislative control and discretion,

not subject to judicial review unless the legislative procedure is mandated by the constitution. 73 Am.Jur.2d Statutes, sec. 49, p. 296. If the legislature fails to follow self-adopted procedural rules in enacting legislation, and such rules are not mandated by the constitution, courts will not intervene to declare the legislation invalid. The rationale is that the failure to follow such procedural rules amounts to an implied *ad hoc* repeal of such rules.

*Id.* at 687. Furthermore, since the asserted interpretation of HB 389(4) so closely adheres to the language of failed SB 349, the actuarial analysis obtained with respect to SB 349 supports the Franklin Circuit Court's finding of substantial compliance with KRS 6.350 with respect to HB 389.

## IV. UNINTELLIGIBILITY.

 The void-for-vagueness doctrine is most often applied in the context of the First Amendment, the criminal law, and punitive civil laws. *See, e.g. Martin v. Commonwealth,* Ky., 96 S.W.3d 38, 59–60 (2003) (First Amendment); *Jones v. Commonwealth,* Ky., 830 S.W.2d 877, 880 (1992) (criminal law); *Vill. of Hoffman Estates v. Flipside,* 455 U.S. 489, 499–500, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982) (civil penalties). However, while statutes affecting those areas should receive the most *rigorous* review and are most *commonly* held void for vagueness, non-punitive civil, regulatory, or spending statutes are also invalid if they are so unintelligible as to be incapable of judicial interpretation. In that circumstance, the statute often is declared void for "unintelligibility" or "uncertainty" as opposed to "vagueness."

The most oft-cited expression of this doctrine in Kentucky is *Folks v. Barren County,* 313 Ky. 515, 232 S.W.2d 1010 (1950), in which our predecessor court was asked to interpret a statute allowing boards of education to finance new school buildings through direct appeals to voters. The Court noted the following proposition of law:

It is not for us to say the Legislature does not have the right to be indirect where it could be direct, or to be obscure and confusing where it could be clear and simple. But where the lawmaking body, in framing the law, has not expressed its intent intelligibly, or *in language that the people upon whom it is designed to operate or whom it affects can understand, or from which the courts can deduce the legislative will,* the statute will be declared to be inoperative and void.

*Id.* at 1013 (emphasis added). The United States Court of Appeals for the Sixth Circuit, citing *Folks,* noted that "Kentucky's highest court has clearly and unwaiveringly [sic]" held that unintelligible statutes will be declared invalid. *Bostic v. E. Constr. Co.,* 497 F.2d 712, 715 (6th Cir. 1974). The Sixth Circuit held in *Bostic,* a tort case for damages caused by fire, that a safety regulation promulgated pursuant to KRS 227,300 was "so vague and confusing as to be unenforceable and invalid." *Id.* at 714. It "simply [did] not possess that degree of clarity necessary for validity . . . ." *Id.* at 716.

*Folks* recognized but did not create this rule. Our predecessor court had previously applied the rule to hold "void for uncertainty" a statute that allowed the local board of trustees of a pension plan to award a pension to a firefighter with twenty years of experience "if his [retirement] application is granted." *Schmid v. Bd. of Trustees,* 146 Ky. 335, 142 S.W. 688, 689 (1912). Even earlier, the Court voided a statute pertaining to the terms of court for the twenty-fourth judicial district, noting

that "[t]he bill is so carelessly drawn that it is impossible to determine just what its author intended . . . ." *Litteral v. Blair*, 139 Ky. 196, 129 S.W. 573, 575 (1910). The Court found that the statute was "inoperative and void" "because its provisions were indefinite and uncertain . . . ." *Id. See also Sullivan v. Brawner*, 237 Ky. 730, 36 S.W.2d 364, 367 (1931) (void-for-vagueness doctrine only applies "with greater emphasis" to criminal statutes); *cf. Moore v. N. Ky. Indep. Food Dealers*, 286 Ky. 24, 149 S.W.2d 755, 758 (1941) (statute should not be invalidated "unless the intention, object and purpose of the legislature was so vaguely presented as to be incapable of intelligent interpretation and correct application").

Many other examples of our adherence to the *Folks* rule exist. Our predecessor court invalidated former KRS 119.070(4), applicable to the nomination of judicial candidates, because "the intent of the subsection in question is so obscure that any effort to ascribe some rational meaning to it would be based solely on conjecture." *Burke v. Stephenson*, Ky., 305 S.W.2d 926, 929 (1957). The Court also invalidated a statute providing that the "prevailing wage" should be paid in public works projects, citing *Folks* and noting "the rule that where the intention of the legislature is so obscure as to defy a rational meaning, the law cannot be given effect." *Kerth v. Hopkins County Bd. of Ed.*, Ky., 346 S.W.2d 737, 741 (1961). The Court applied the rule later to invalidate a law that purported to tell a sheriff when a prisoner convicted of a misdemeanor was eligible for parole. *Murphy v. Cranfill*, Ky., 416 S.W.2d 363 (1967). Although this statute obviously related to criminal law, the Court did not invalidate it for failure to fairly notify potential offenders of punishable conduct or even the type of punishment for such conduct, but because it was unintelligible.

All parties have assumed this to be a valid law unless it violates some specific provision of the Kentucky Constitution, but there is another ground upon which we may declare this enactment ineffective as a law. That is the lack of intelligibility. In other words, if the language of the law is so ambiguous as to completely obscure the legislative intent and to defy rational meaning, it is simply inoperative as a law.

*Id.* at 364. Citing *Kerth* and *Folks*, the Court found that the relevant words in the statute were "meaningless;" thus, it deemed the statute "an abortive effort" and "a nullity." *Id.* at 366.

Kentucky is not alone in requiring that statutes be facially intelligible. In *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill.2d 389, 113 Ill.Dec. 915, 515 N.E.2d 1222 (1987), the Supreme Court of Illinois invalidated a statute permitting teachers to inspect some, but not all, of the documents in their personnel files because that statute was so vague that it was impossible for school districts to discern which documents were subject to disclosure. *Id.* at 1228. It noted the rule that:

While it is the duty of the courts to ascertain the meaning of and to give effect to every valid act of the legislature, yet they cannot supply omissions or remedy defects in matters committed to the legislature. A legislative act which is so vague, indefinite and uncertain that the courts are unable, *by accepted rules of construction*, to determine, with any reasonable degree of certainty, what the legislature intended, or which is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, will be declared to be inoperative and void.

*Id.* at 1228 (emphasis added, internal quotations and citations omitted). (Thus, as

also suggested in *Folks, supra,* at 1013, it is insufficient that a pension plan expert might be able to interpret HB 389(4) if a Court could not interpret it by the application of accepted rules of construction.). *See also Opinion by the Justices,* 249 Ala. 88, 30 So.2d 14, 17–18 (1947) (invalidating statute authorizing state to contribute to life insurance premiums for state officers and employees because statute "lacks in reasonable precision, and is so uncertain and indefinite as to render it inoperative"); *Mo. Pac. R.R. Co. v. Morris,* 345 S.W.2d 52, 57, 59 (Mo.1961) (en banc) (invalidating excise tax law where words were "vague, indefinite and uncertain," and noting the rules that "where the statutory terms are of such uncertain meaning, or so confused, that the courts cannot discern with reasonable certainty what is intended, they will pronounce the enactment void," and "a mere collection of words can not constitute a law; otherwise the dictionary can be transformed into a statute by the proper legislative formula.").

Section 4 of HB 389 is worse than all of the invalidated laws described *supra* because it is *intentionally* incomprehensible as stated by Senator Robinson in his May 18, 2000, letter to the Attorney General:

> Since it was our intent to not make the provision of the amendment so visible
> . . . .

Letter from Sen. Robinson to Carrico, *supra,* at 1.

The Framers of the present Kentucky Constitution were so concerned about surreptitious legislation that they enacted Section 51. *See Martinez v. Commonwealth,* Ky., 72 S.W.3d 581, 584 (2002) (the purpose of Section 51 "is to prevent surreptitious legislation, and to prevent surprise and fraud upon the members of the General Assembly and other interested parties"). While Section 51 is not at issue

here, it provides structural support for the fundamental common-law proscription against intentionally obscure statutes. One commentator has addressed the perniciousness of this kind of legislative strategy in the context of tax legislation:

> Certain [tax] provisions meant to favor a powerful special interest are intentionally written in obscure styles. The obscurity not only limits the benefit of such provisions to the narrow interest group, it also makes it less likely that the public at large will discover, understand and criticize the favor.

Edward J. McCaffery, *The Holy Grail of Tax Simplification,* 1990 Wis. L.Rev. 1267, 1284–85 (1990). That concern is magnified when the special interest group favored by the disguised benefit is the legislature, itself. Our Constitution is clearly wary of self-serving legislation, providing in Section 57 that "[a] member who has a personal or private interest in any measure or bill . . . shall disclose the fact . . . ," and in Section 235 that "[t]he salaries of public officers shall not be changed during the terms for which they were elected." Again, the Attorney General does not allege a violation of either Section 57 or Section 235, but it would contradict the constitutional rationale behind those Sections to validate a deliberately surreptitious attempt by the General Assembly to increase its own retirement benefits.

█ Appellants correctly assert that only constitutional infirmities can void legislation. Ky. Const. § 27 (providing for separation of powers among the three branches of government); Ky. Const. § 28 (forbidding any department from "exercis[ing] any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted"); Ky. Const. § 29 (vesting legislative power in the General Assembly). In the context of laws that constrain speech,

the constitutional foundation of the void-for-vagueness doctrine is the First Amendment. In the context of criminal law, the constitutional foundation is the Due Process Clause of the Fifth and Fourteenth Amendments. So where is the constitutional foundation for the *Folks* unintelligibility rule? Despite language in *Murphy v. Cranfill, supra,* at 364, suggesting that no constitutional foundation is required, the unintelligibility rule has its foundation in the constitutional requirement of separation of powers. *Miller v. Covington Dev. Auth.,* Ky., 539 S.W.2d 1, 4–5 (1976) (invalidating a statute because it so "lacked legislative criteria" as to impermissibly delegate lawmaking power to the executive). In that respect, the unintelligibility rule intersects with the nondelegation doctrine discussed *infra.* If the legislature empowers the executive branch with authority to implement a statute without sufficient guidelines, it effectively delegates lawmaking to the executive branch. Without guidelines contained in the statute, itself, the executive branch must guess at the intent of the legislature and is thereby transformed from implementer of the law into maker of the law.

The same is true when the judicial branch is asked to interpret an unintelligible statute. *Sullivan v. Brawner, supra,* suggested that separation of powers is the reason the Court must invalidate unintelligible statutes. When faced with unintelligibility, "the court can do nothing but conjecture, and in doing so it would allocate to itself legislative functions, but which is everywhere conceded it has no right to do." 36 S.W.2d at 368. Stated differently, it is impossible to interpret language that is unintelligible. Thus, when faced with such language, the court has only two options. It may legislate by saying, "this unintelligible language means X," or, it may declare the law invalid and give the General Assembly an opportunity to write an intelligible statute. In fact, if the General Assembly did intend for HB 389(4) to amend KRS 61.510(13), the withdrawn version of SB 349 exemplified how it could draft such an amendment in an intelligible fashion.

■ Section 29 of the Kentucky Constitution provides another constitutional foundation for the *Folks* rule:

The legislative power shall be vested in ... the "General Assembly of the Commonwealth of Kentucky."

Obviously, an attempted exercise of legislative power is simply ineffective if the legislative product is unintelligible. In that event, no legislative power has been exercised. *See Murphy v. Cranfill, supra,* at 366 (unintelligible statute was an "abortive effort" and a "nullity").

## V. NONDELEGATION DOCTRINE.

■ The United States Supreme Court has expressed concern with respect to improper delegation of legislative authority. In short, the nondelegation doctrine recognizes that the Constitution vests the legislative power exclusively in Congress, U.S. Const. art. I, § 1, and under the doctrine of separation of powers, Congress must exercise that power rather than delegate it to the executive or judicial branches. Nevertheless, given the realities of modern rule-making, Congress has neither the time nor the expertise to do it all; it must have help. *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989) ("[O]ur jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.").

■ The compromise developed by the Court is that Congress must "lay down by

legislative act *an intelligible principle* to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928) (emphasis added).

> The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes.

*Loving v. United States,* 517 U.S. 748, 771, 116 S.Ct. 1737, 1750, 135 L.Ed.2d 36 (1996). Nevertheless, the Court has been notoriously lax in reviewing delegations unaccompanied by intelligible principles. Indeed, the Court conceded in a recent opinion:

> In the history of the Court we have found the requisite "intelligible principle" lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring "fair competition." *See Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 474, 121 S.Ct. 903, 913, 149 L.Ed.2d 1 (2001).

█ Kentucky holds to a higher standard. Our predecessor court noted that Kentucky is more "restrictive of powers granted" than the federal Constitution because the federal Constitution does not have a "provision expressly forbidding the Congress to delegate its legislative powers," as do Sections 27, 28, 29, and 60 of the Kentucky Constitution. *Bloemer v. Turner,* 281 Ky. 832, 137 S.W.2d 387, 390–

91 (1939). Thus, federal decisions do not have "the usual persuasive force" when it comes to delegation issues. *Id.* at 391. Indeed, in the area of nondelegation, Kentucky may be unsurpassed by any state in the Union.

> Perhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does our Constitution ....

*Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455, 457 (1922). *See also Diemer v. Commonwealth,* Ky., 786 S.W.2d 861, 864 (1990) ("Kentucky is a strict adherent to the separation of powers doctrine.").

Like the federal "intelligible-principle rule" articulated in *J.W. Hampton, supra,* Kentucky law mandates that "the legislature must lay down policies and establish standards." *Bloemer, supra,* at 391. However, our rule has not been as toothless as the "intelligible-principle rule." In *Miller v. Covington Development Authority, supra,* we declared unconstitutional the former Local Development Authority Act, KRS 99.610–.680, which created and delegated to a local agency broad power to preserve and restore historically or economically "significant local areas." 539 S.W.2d at 2. These powers were granted without "legislative criteria," thus, we held that the statute was an impermissible delegation. *Id.* at 4–5.

In *Fawbush v. Bond,* Ky., 613 S.W.2d 414 (1981), we invalidated former KRS 67.045, which delegated to the district court the responsibility to evaluate proposed redistricting plans and to establish new boundaries in the event such proposals were disapproved. We held that while the General Assembly could delegate the power to review a redistricting proposal with statutory guidelines, KRS 67.045

"provide[d] no criteria whatever for such a review." *Id.* at 415.

In *Legislative Research Commission v. Brown,* Ky., 664 S.W.2d 907 (1984), we invalidated a statute delegating legislative power to the Legislative Research Commission during periods of legislative adjournment because, *inter alia,* the delegation lacked "standards controlling the exercise of administrative discretion." *Id.* at 915. Most recently, we held that KRS 177.863, which charged the Transportation Cabinet with limiting the proliferation of moving or flashing lighted signs, violated the nondelegation doctrine because it gave "no guidance" to the Cabinet in interpreting crucial provisions of the statute. *Flying J Travel Plaza v. Commonwealth,* Ky., 928 S.W.2d 344, 350 (1996). *Cf. Preston v. Clements,* 313 Ky. 479, 232 S.W.2d 85, 89 (1950) (upholding delegation for purposes of building new Capitol Annex when it provided "an adequate standard" to govern the State Property and Buildings Commission); *Young v. Willis,* 305 Ky. 201, 203 S.W.2d 5, 8 (1947) (upholding statute that stated "the subject, nature and extent" of the delegation, "declar[ing] its policy and prescrib[ing] standards for the guidance of the administrative agency").

Three cases applying the nondelegation doctrine illustrate the possible confluence of that doctrine with the *Folks* unintelligibility rule discussed *supra.* That confluence was explicitly recognized in *Kerth v. Hopkins County Board of Education, supra,* wherein the Court wrote that it did not need to reach the nondelegation question because the statute was so obscure that it was invalid under the *Folks* rule alone. 346 S.W.2d at 742. However, *Kerth* observed in *dicta* that the statute's vagueness also necessarily meant that it

would fail to pass muster under the nondelegation doctrine. *Id.* Recognizing the rule that "it is fundamental that the legislature must prescribe some standard governing the scope of administrative action," *id.* at 741, *Kerth* noted that in the delegation to the Wage Board:

> There is simply nothing in this legislation which offers any clue to what the legislature intended should guide and control the Board's determination of proper "prevailing wage" rates. Not only is the Board left completely adrift ... but no one, including this court, is furnished any criteria by which to determine whether the Board is carrying out the assumed legislative policy as the legislature intended ....

*Id.* Thus, while *Kerth* could have invoked the nondelegation doctrine to void the statute, the fundamental obscurity of the law provided sufficient grounds for invalidation, making the nondelegation approach "unnecessary." *Id.* (The above-quoted passage from *Kerth* applies equally to HB 389(4).)

The second example of the confluence between the unintelligibility rule and the nondelegation doctrine appears in *Diemer v. Commonwealth, supra,* in which the Kentucky Billboard Act, former KRS 177.830–.890, was challenged as being void for vagueness and an unconstitutional delegation to the Secretary of Transportation. We addressed both issues, finding first that the Billboard Act, which regulated billboard signs more than 660 feet from an "urban area," 786 S.W.2d at 864, was "confusing to the point of being unintelligible" so that it "fail[ed] to put a particular property owner on notice as to whether his property is or is not within an urban area." *Id.* at 865.[2] Second, we found that the

---

**2.** *Diemer,* unlike the other cited cases, arguably involved the First Amendment because it prohibited the erection of billboards in certain circumstances. Thus, *it is distinguish-*

delegation to the Transportation Secretary did not cure the confusion because the statute did not contain "sufficient standards controlling the exercise of that discretion . . . ." *Id.* (quotation omitted). Thus, we deemed the statute an unconstitutional delegation. *Id.* at 866.

Finally, our predecessor court voided the pension law in *Schmid v. Board of Trustees, supra,* because that law gave the local Board of Trustees virtually unfettered discretion to decide when a firefighter's retirement application would be granted for purposes of collecting his pension. 142 S.W. at 690. Recall that, as discussed *supra,* the statute allowed a firefighter with twenty years' experience to collect his pension "if his application is granted." *Id.* at 689. The Court found this statute "void for uncertainty" precisely because "the whole matter seems to have been intentionally left to the discretion of the board without any standard to guide it." *Id.* at 690. Thus, in an early articulation of the nondelegation doctrine, *Schmid* held:

> The Legislature cannot confer upon its creature [the Board of Trustees] arbitrary power to use this fund as it may see proper. In authorizing the board to grant a pension, the Legislature must define the persons who are to receive the pension, so that the board will have a standard to guide it. It cannot leave the board to grant or refuse a pension at its whim or pleasure.

*Id.* As in *Schmid,* HB 389(4) left its purpose to the conjecture of the Board of Trustees. If the legislative intent in amending KRS 21.450 was, instead, to amend KRS 61.510(13), that fact is certainly not apparent, or even vaguely discernible, from the language of the bill. The bill

able from those cases that apply the void-for-vagueness doctrine (or some version thereof) outside the context of the First Amendment, the criminal law, and those civil laws with

contains no clue as to where to look for an "applicable statute" that provides an "accrual of benefits." Certainly, one would not expect to look to KRS 61.510(13), which defines "creditable compensation" and does not provide an "accrual of benefits."

Kentucky's strong stance against vague delegations also protects the rights of Kentucky voters. Professor John Hart Ely argues that the worst delegations often occur because "our representatives quite shrewdly prefer not to have to stand up and be counted but rather to let some executive branch bureaucrat . . . take the inevitable political heat." John Hart Ely, *Democracy & Distrust: A Theory of Judicial Review,* 132 (Harvard University Press 1980) (quotation omitted). The "intelligible principle" requirement of the nondelegation doctrine is designed to prevent legislators from deliberately passing vaguely worded special interest (or self-interested) legislation and acting surprised when the true nature of the legislation comes to light. Professor Ely quotes Congressman Flowers's remarks about this tactic:

> "[T]hen we stand back and say when our constituents are aggrieved or oppressed by various rules and regulations, 'Hey, it's not me. We didn't mean that. We passed this well-meaning legislation, and we intended for those people out there . . . to do exactly what we meant, and they didn't do it." '

*Id.* Ely argues that the feeble enforcement of the intelligible principle rule by the United States Supreme Court has allowed "legislators [to] escap[e] the sort of accountability that is crucial to the intelligible functioning of a democratic republic." *Id.* Not so in Kentucky.

punitive provisions. It is cited here only for its precedential value to the nondelegation question and the light it sheds on the confluence between the two doctrines.

Under our precedents, HB 389(4) is clearly an unconstitutional delegation. Put simply, this unintelligible statute has neither "an intelligible principle," *J.W. Hampton, supra,* at 409, 48 S.Ct. 348, nor "standards controlling the exercise of administrative discretion." *Legislative Research Comm'n v. Brown, supra,* at 915. A review of the questions posed to the Attorney General by the executive director of the JFRS exemplifies the confusion generated by a statute so unintelligible as to defy comprehension by those charged with its implementation. In fact, this statute is so unintelligible that we, unlike the Franklin Circuit Court, are unconvinced that even an expert in the field of pension benefits could, absent Senator Robinson's proffered advice of *his* legislative intent, discern that the intent of this statute was to amend KRS 61.510(13) and thereby effectuate a 72% increase in legislative pensions. Regardless, the citizens of this Commonwealth are entitled to legislation that is "written in nontechnical language and in a clear and coherent manner using words with common and everyday meanings," KRS 446.015, so that it can be reasonably understood by those charged with its implementation (and those charged with its judicial construction) without resort to "expert" opinion. HB 389(4) simply does not give sufficient guidance of its meaning and intent to its "creature," the Board of Trustees, *Schmid, supra,* at 690, and thus fails to pass muster under both the unintelligibility rule and the nondelegation doctrine.

## VI. PAROL EVIDENCE AND STATUTORY CONSTRUCTION.

■ For the reasons discussed *supra,* we conclude that HB 389(4) is facially unintelligible and incapable of interpretation by application of normal rules of construction.

[A]ny effort to ascribe some rational meaning to it would be based solely on conjecture.

*Burke v. Stephenson,* 305 S.W.2d at 929. While we have a duty to, "if possible, sustain the validity of the act and expound it," perhaps by "judicial construction," *Folks,* 232 S.W.2d at 1013, that duty does not permit us to become legislators and assign meaning where none is apparent. *Sullivan,* 36 S.W.2d at 368 ("Under such conditions [of unintelligibility] the court can do nothing but conjecture, and in doing so it would allocate to itself legislative functions, but which is everywhere conceded it has no right to do.").

The only legislative history of relevance is that the original version of SB 349, which stated with *clarity* an intent to increase the "assumed salary" in KRS 61.510(13), was withdrawn when it became obvious that it would not pass. 2000 Sen. J. 1959 From that fact, one would logically assume that KRS 389(4) was *not* intended to increase the "assumed salary" in KRS 61.510(13). Certainly, no debate occurred with respect to HB 389(4) as it had with respect to SB 349. Of course, if HB 389(4) was intended to accomplish precisely what had caused the withdrawal from consideration of original SB 349, any such debate would have foiled the drafter's expressed intent to disguise the true nature of the bill.

Thus, we are left with Senator Robinson's own *ex post* interpretation of HB 389(4) and the opinion letter of William P. Hanes, deputy commissioner of the Kentucky Retirement Systems. The interpretations submitted by Senator Robinson and Hanes are contained in separate letters mailed to the Attorney General on the same date, May 18, 2000. Hanes's letter appears to have been written after consultation with Senator Robinson and to sim-

ply defer to his interpretation (which is apparently joined by two House members):

> Although the language used in the amendment is less than clear, the *objectives stated by Senator Robinson* and Representatives Arnold and Gray certainly *appear to be* a reasonable construction of the language used in the provision.

Letter from Hanes to Carrico of 5/18/00, at 4 (emphasis added).

■ It is a basic principle of statutory construction that legislative intent may not be garnered from parol evidence, especially parol evidence furnished by a member of the legislature, itself.

> The sources from which such intention and purpose are to be gathered are primarily the words employed, and, if they are ambiguous, or even apparently contradictory, resort may be had to the title of the statute, which is an index to the subject-matter to be dealt with, and, in case of a constitutional provision, the subject-matter under consideration by the convention that framed it may likewise be taken into consideration. Also in both constitutional provisions and statutes the intention and purpose of the body creating them may in such doubtful contingencies be arrived at by consulting the journals of their proceedings and thereby ascertain the thoughts and expressed intention of the numbers [sic] of the body when the involved matter was under consideration. *Of course, the purpose and intention above referred to may not be established by parol testimony or other evidence de hors the journals containing the proceedings of the body* that brought into existence the particular law under consideration.

*Wheeler v. Bd. of Comm'rs,* 245 Ky. 388, 53 S.W.2d 740, 742 (1932) (emphasis added). *See also Decker v. Russell,* Ky., 357 S.W.2d 886, 888 (1962) (rejecting testimony of two members of the enacting General Assembly as to the intent of the act); 2A Norman J. Singer, *Sutherland Statutory Construction* § 48.16, at 478–79 (6th ed. 2000) ("In construing a statute the courts refuse to consider testimony about the intent of the legislature by members of the legislature which enacted it."). *Compare* the United States Court of Appeals for the Third Circuit's treatment of a similar attempt by the sponsor to explain *ex post* an amendment to the Civil Rights Act:

> As the amendment's sponsor, *Senator Bennett's understanding of the amendment might have been entitled to some weight if it had been expressed contemporaneously with the passage of the legislation.* Coming one year after the Bennett Amendment was enacted, however, *the statement at best reflects what was on Senator Bennett's mind when he introduced the amendment and is entitled to no weight* .... If Senator Bennett's "clarifying" statement has any significance it must be as evidence that the amendment was ambiguous on its face and that its contemporaneous legislative history was not enlightening.

*Int'l Union of Elec., Radio & Mach. Workers v. Westinghouse Elec. Corp.,* 631 F.2d 1094, 1104 (3d Cir.1980) (emphasis added). The rule against accepting after-the-enactment interpretations by individual legislators has more urgency when the legislation is self-serving and the legislator in question admits to having deliberately obscured the bill's meaning. *Cf. Brown v. Thompson,* 252 F.Supp.2d 312, 316 (E.D.Va.2003) ("Resort to legislative history ... must be undertaken with caution in those instances where lawmakers deliberately insert an ambiguity to mask a political disagreement and then paper the legislative history record with advocacy statements.").

Nor is Hanes's opinion letter entitled to the type of deference afforded an adminis-

trative agency's construction of a statute that it is charged with implementing. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). In the first place, Hanes is not charged with implementing the JFRS. *See* KRS 61.645(1) (Board of Trustees of Kentucky Retirement Systems administers County Employees Retirement System, Kentucky Employees Retirement System, and State Police Retirement System). That function is vested in the Board of Trustees of the JFRS. KRS 21.540. Secondly, *Chevron*-style deference is normally granted only when the agency interpretation is in the form of an adopted regulation or formal adjudication. *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *Mid–America Care Found. v. N.L.R.B.*, 148 F.3d 638, 642 (6th Cir.1998) ("*Chevron* deference is limited in application to those situations in which the administrative agency has formally adopted a particular interpretation of a statute."); *Johnson City Med. Ctr. v. United States*, 999 F.2d 973, 976 (6th Cir.1993) ("[A] revenue ruling, as opposed to a legislative regulation, is not entitled to the deference accorded a statute.") (quotation omitted). For the same reason, we decline to defer to the interpretation advanced in the Appellant's brief filed on behalf of the JFRS.

Rather than accept at face value the lengthy and somewhat convoluted attempts by Senator Robinson and Mr. Hanes to explain how an amendment of KRS 21.450 actually amended KRS 61.510(13), we conclude, as did the Third Circuit in *International Union of Elec., Radio & Mach. Workers v. Westinghouse*

*Elec. Corp., supra,* that if their attempted explanations have any significance, "it must be as evidence that the amendment was ambiguous on its face and that its contemporaneous legislative history was not enlightening." *Id.* at 1104. In fact, Hanes's five-page, single-spaced opinion letter attempting to interpret the one sentence (34 words) contained in HB 389(4) merely exemplifies how this statute violates the nondelegation doctrine.

We conclude that HB 389(4), subsequently codified at KRS 21.450(3), is unconstitutional because it is unintelligible and violates the nondelegation doctrine embodied in Sections 27, 28, 29 and 60 of our Constitution. Accordingly, the decision of the Court of Appeals is affirmed, though on different grounds than expressed in its opinion.

GRAVES, JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs by separate opinion.

LAMBERT, C.J., not sitting.

WINTERSHEIMER, Justice, Concurring.

I concur with the result achieved by the majority opinion, but I do not agree with much of its reasoning. As correctly determined by the Court of Appeals, KRS 6.350 requires an actuarial analysis for any legislation which would increase the benefits or change the financial liability of any public retirement system before the legislation leaves committee for consideration by the full legislative body and that the actuarial analysis must accompany the legislation. The statute clearly states that an analysis must be prepared by an actuary who is a fellow of the Society of Actuaries, a member of the American Academy of Actuaries or an enrolled actuary under the Employ-

ees' Retirement Income Security Act of 1974. The analysis must indicate the economic effect of the bill on a public retirement system, project the cost of increased benefits and describe assumptions and methods of computation.

It is beyond question that KRS 6.350 relates to an important benefit in connection with the provisions of KRS 21.450. It is a matter of significant public interest. In these days of financial flexibility and dramatic shifts in economic status, it cannot be said that an increase in benefits to one segment of the retirement community could not ultimately impact vested pension benefits of retired employees in other classifications. In this case, it appears that the only information that the members of the General Assembly had in regard to the amendment of KRS 21.450 was to the effect that there was a report from the executive director of the retirement system that says, "I am unable to determine the fiscal impact, if any, of Section 4."

The argument made by the Board and accepted by the majority opinion that the statute only requires that a request be made to constitute sufficient compliance is totally without merit. As previously noted, KRS 6.350 mandates that the study be set out in detail and attached to the legislation for consideration before it can be enacted. Although the circuit court properly found that this was not accomplished, it nevertheless improperly concluded that the only requirement was that the request be made and that there was substantial compliance with the statute.

The Court of Appeals correctly found that the failure to comply with the clear requirements of the statute render the amendment to KRS 21.450 void with respect to HB 389. The analysis by the Court of Appeals regarding the plain language of the statute is beyond question. KRS 6.350(1) provides that a pension bill "shall not be reported from a legislative committee of either house of the General Assembly for consideration by the full membership of that house unless the bill is accompanied by an actuarial analysis." The word "shall" is mandatory and not permissive. See KRS 446.010(29).

My greatest difficulty with the rationale presented by the majority is the reference to what it considers merely procedural matters as distinguished from substantive law. Substantive law is that part of the law which creates, defines and regulates rights and duties. Procedural law is an apparatus provided by statute or rule which prescribes a method of legislative operation in enacting substantive provisions. The distinction between substantive and procedural law is that substantive law relates to the rights and duties giving rise to a cause of action while procedural law is the mechanism used for carrying out a practical method of operation. Here, KRS 6.350 defines the responsibility of the General Assembly when amending the pension statutes. The legislature cannot simply ignore the existing statute.

The statute here is not procedural but gives a clear direction as to how the particular law is to be adopted and what conditions must be satisfied. This is not a matter of parliamentary procedure which would be clearly within the realm of the General Assembly, but something that applies to people outside of the legislative body in that it may affect the vested pension benefits of other retired employees.

There is no question that Section 39 of the Kentucky Constitution vests the General Assembly with authority to determine the rules of its own proceedings. See Philpot v. Haviland, Ky., 880 S.W.2d 550 (1994). As noted in my dissent in Philpot v. Patton, Ky., 837 S.W.2d 491 (1992), I firmly believe that this Court cannot tell either house of the General Assembly what

system or rules it can enact. In other words, the legislature is free to enact its own legislative and procedural rules and that such action cannot be challenged because of their propriety and wisdom. However, because this is a departure from procedural practice and clearly a substantive provision of the law, the failure to comply with KRS 6.350 is fatal.

It has been held, except that in legislation involving contract rights, that each legislature is entirely independent of its predecessor and is vested with complete authority to amend or repeal existing laws at its pleasure. *City of Mt. Sterling v. King*, 126 Ky. 526, 104 S.W. 322 (1907). Here, the retirement plan in question is a legal contract. KRS 6.525 relates to the governance of such plan and expressly adopts KRS 21.480, which in pertinent part refers to the pension system as an inviolate contract in which the rights and benefits provided therein shall not be subject to reduction or impairment by alteration, amendment or repeal. The constitution of Kentucky in Section 19, protects state pensioners from the General Assembly unilaterally amending statutes that impact the pension system. The constitution provides that no law impairing the obligation of contracts shall be enacted. *See also* 16B. Am.Jur.2d *Constitutional Law* § 721 (1998).

When the interpretation of a statute affects persons other than current members of the General Assembly, the question presented is of necessity a judicial one. *See United States v. Smith*, 286 U.S. 6, 52 S.Ct. 475, 76 L.Ed. 954 (1932). Here, it is entirely possible that the increase in the pension benefits, although totally justified, could potentially jeopardize pension benefits for retired legislators or other state employees. *Cf. Valdes v. Cory*, 139 Cal. App.3d 773, 189 Cal.Rptr. 212 (Cal.Ct.App. 1983), which indicates that the California

legislature was not free to randomly and unilaterally act without actuarial input from the board overseeing the public retirement system. Many other state courts agree. *See Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1989), citing cases. The action of the legislature here, which ignores the statute largely without debate or an informed vote by the entire General Assembly, violates many sections of the Kentucky Constitution, including Section Two, which states absolute and arbitrary power does not exist anywhere in the Republic, not even in the largest majority. *See also* Kentucky Constitution §§ 19 and 25.

This Court declined to extend or apply the holding of *Valdes, supra,* in *Jones v. Bd. of Trustees, Ky. Retirement Systems,* Ky., 910 S.W.2d 710 (1995). However, *Jones, supra,* is distinguishable because here, the General Assembly chose to ignore statutes requiring the actuarial analysis before increasing benefits. In *Jones,* it was argued that the system had independence to set contribution rates.

I doubt if anyone would seriously challenge the proposition that the General Assembly is not above the law. The law as commonly defined includes statutes as well as constitutional provisions. It is the responsibility of this Court to decide in a proper case, whether the actions of the General Assembly comply with the Constitution of Kentucky, or the laws of this Commonwealth. Certainly, there is a procedure for changing statutes and it is well known and regularly and routinely used by the General Assembly in reaching a different conclusion from the effect of a statute originally enacted. Simply stated, it is repeal by direct action of previous legislative pronouncements.

Moreover, there is the opportunity to permit the people of Kentucky to amend the constitution if the General Assembly so

chooses. Respectfully, I do not believe that the General Assembly can repeal an existing statute by implication. "Repeal by implication finds no favor within the courts." *See Caterpillar, Inc. v. Brock,* Ky., 915 S.W.2d 751, 753 (1996).

I do concur with the view expressed by the majority that the amendment of KRS 21.450 by Section 4 of the House Bill is unconstitutionally vague and impermissibly delegates the legislative authority to an administrative agency without sufficient guidance. *See Folks v. Barren County,* 313 Ky. 515, 232 S.W.2d 1010 (1950), and many other cases as cited by the majority.

There is a vast difference between substantial compliance and no compliance. Here, the legislature failed to follow the clear and unambiguous language of the statute. The statute is mandatory and not directory. The legislature simply made a mistake in approaching the pressing problem of pension modification. The problem is easily corrected by an appropriate legislative enactment.